556 A.2d 899

The RUSSELL NATIONAL BANK, Appellant,

v.

Floyd E. SMITH, d/b/a L. Smith & Son

v.

Robert E. WOLFLEY, Tony Wolfley, Robert E. Moore and Audrey M. Moore (Two Cases).

Superior Court of Pennsylvania.

Argued June 13, 1988.

Filed April 6, 1989.

266

Peter J. O'Donnell, Lewistown, for appellant (at 617 and 652).

James N. Bryant, State College, for Smith, appellee (at 617 and 652).

Before CIRILLO, President Judge, and WIEAND and DEL SOLE, JJ.

CIRILLO, President Judge:

This is an appeal from a judgment of the Court of Common Pleas of Mifflin County. We reverse and remand.

On April 21, 1982, Robert and Tony Wolfley entered into an installment sales contract with the appellee, Floyd Smith, d/b/a L. Smith & Sons, (Dealer), to purchase a mobile home. The Dealer immediately arranged for the assignment of this contract to appellant, The Russell National Bank (Bank), who advanced the Dealer the sum of approximately ten thousand eight hundred dollars ($10,800.00). The assignment was made with "full recourse," [1] whereby the Dealer agreed to repurchase the contract upon default

1. The assignment contract contains three endorsement options: (1) without recourse; (2) repurchase; and (3) full recourse. Under the contract, only one of the three options can be operative. The contract indicates that the Dealer was to choose the operative endorsement and that he chose the full recourse provision.

of the installment sales contract by the Wolfleys and upon demand by the Bank.

The Wolfleys subsequently defaulted on the sales contract. In March or April of 1983, Mr. Wolfley moved out of the trailer because of marital discord. On September 19, 1983, the Bank sent the Wolfleys a Notice of Default and Intent to Execute. This document advised the Wolfleys that the Bank intended to execute if the default was not cured within thirty-five (35) days. Upon receiving this notice, Mrs. Wolfley decided to abandon the mobile home rather than cure the default. She called the Bank to notify it that she intended to move out and drop off the keys.

On November 12, 1983, Mrs. Wolfley abandoned the mobile home. On November 22, 1983, the Bank sent the Wolfleys notice, as required by the Motor Vehicle Sales Finance Act (MVSFA), 69 P.S.A. § 623 G, that their "motor vehicle" had been repossessed.

Although continuing to hold title to the mobile home, the Bank has not taken any steps to actually physically repossess it. The home remains in its original trailer park, where the Dealer is general manager; it has been winterized by the Dealer and moved approximately 100 feet to make way for paying tenants.

Pursuant to the "full recourse" provision, the Bank made numerous oral and written demands upon the Dealer to repurchase the contract. The Dealer, however, refused to do so. Approximately one year later, on December 20, 1985, the Bank instituted suit against the Dealer under the full recourse contract. The complaint averred that the contract was with full recourse and as a result of the Wolfleys' default, the Dealer was required to repurchase the contract from the Bank.

The Dealer subsequently joined the Wolfleys as additional defendants.[2] The matter proceeded to trial, at which time the trial court entered a directed verdict against the Bank.

2. At trial, the Bank and the Dealer waived all claims against the Wolfleys in return for the Wolfleys' agreement not to counterclaim; thus, the Wolfleys are no longer involved in this action.

The Bank filed a timely motion for post-trial relief which was denied by the trial court on August 31, 1987. Thereafter, on September 29, 1987, the Bank filed a notice of appeal. However, judgment was not entered against the Bank until October 19, 1987. The Bank subsequently filed a second notice of appeal on October 20, 1987, and the appeals were consolidated.[3]

The Bank raises the following five issues for our review: (1) whether the trial court erred in determining that it repossessed the mobile home as a matter of law; (2) whether the trial court erred in concluding that the Dealer was entitled to notice of the Bank's intent to execute; (3) whether the trial court erred in holding that the Bank's repossession of the mobile home negated the full recourse provision of the assignment contract; (4) whether the Bank is entitled to judgment against the Dealer as a matter of law; and (5) whether material issues of fact precluded a directed verdict.

The Bank first argues that the trial court erred in holding that it had repossessed the property from the Wolfleys. The Bank argues that because it never intended to take actual possession of the mobile home, its actions cannot be held to amount to physical or constructive repossession of the mobile home. The Bank claims that this argument is strengthened by the fact that it never took any action to stop the Wolfleys or anyone else, for example, the Dealer, from entering or even relocating the home.

We agree with the trial court that the Bank did repossess the mobile home. On September 19, 1983, the Bank sent the Wolfleys a Notice of Default and Intent to Execute. This letter complied with the MVSFA, 69 Pa.S. § 623 G.1, which delineates the requirements a holder must meet before taking action against an installment buyer in default. Mrs. Wolfley, whose husband had moved out by this time, contacted the Bank and told them that she would bring

3. Appeal number 00617 was filed prior to the entry of judgment. Although this appeal is technically interlocutory under Pa.R.A.P. 301(a), Pa.R.A.P. 905(a) allows us to treat this appeal as perfected. Because appeal number 00652 presents the same issues as number 00617, we dismiss number 00652 as duplicative.

them the keys. Mrs. Wolfley then vacated the premises. Following this, on November 22, 1983, the Bank sent the Wolfleys another letter notifying them that their property had been repossessed. Throughout these events, the Bank held title to the mobile home.

These actions were sufficient to establish repossession even though the Bank did not take physical possession of the mobile home. It was not necessary for the Bank to move the mobile home to storage, or to chain the door closed. Having the property voluntarily surrendered to it, along with holding title and having the opportunity and right to physically control the property, was sufficient to constitute repossession. The fact that the Bank did not object when the Dealer moved and winterized the home after the Bank had repossessed it does not affect this conclusion.

■ The next issue which the Bank raises concerns the trial court's holding that the Bank was required by 69 Pa.S. § 623 G.1 to give the Dealer notice of its intent to execute. Section 623 G.1 states:

> Before any holder may ... take possession of any security of the installment buyer ... such person shall give the installment buyer notice of such intention ... *Notice of intention* to take action as specified in this subsection *shall be in writing, and sent to the installment buyer* by registered or certified mail *at the address where the mobile home is located.*

69 Pa.S. § 623 G.1 (supp.1988) (emphasis added). Whether the Bank was required to give the Dealer notice under this section depends on whether the Dealer fits within the definition of "installment buyer." Section 603(3) answers this question. Section 603(3) defines "installment buyer" as:

> [T]he person who buys, hires or leases a motor vehicle under any installment sale contract or any legal successor in interest to such person, and shall continue to designate such person notwithstanding he may have entered into one or more extensions, deferments, renewals or other

revisions of the original contract, *and includes any person who as* surety, endorser, *guarantor,* or otherwise, *is liable on the obligation created by the buyer under an installment sale contract.*

69 Pa.S. § 603(3) (emphasis added). The Dealer clearly fits under this definition, and as such, the trial court properly held that the Bank was required to give written notice of its intent to execute to the Dealer as well as to the Wolfleys.

■ The Bank's failure to comply with this notice requirement, however, does not of itself discharge the Dealer from its obligation under the full recourse provision of the assignment contract. Rather, the lack of notice releases the Dealer from its liability under the contract only if the Dealer was injured by the lack of notice and then only to the extent of the injury. *See* 38 Am.Jur.2d Guaranty § 107, at 1113 (1968) (failure to give notice of debtor's default to guarantor "only releases the guarantor to the extent that damage or prejudice may have been occasioned to him by lack of notice"); 38 C.J.S. Guaranty § 63, at 1225 (1943) ("[T]here must be not only a want of notice within reasonable time, but also some actual loss or damage thereby caused to the guarantor, and if such loss or damage does not go to the whole amount of the claim, but is only in part, the guarantor is discharged only pro tanto."). As one authority stated: "If the guarantor is shown to have suffered no injury or damage, the question as to his [or her] liability is not affected by the want of notice." 38 Am. Jur.2d Guaranty § 107, at 1113 (footnote omitted).

Our review of the record indicates that the Dealer was not prejudiced by the Bank's failure to give notice. According to Mr. Smith's own testimony, he, as the Dealer, had actual knowledge on the day Mrs. Wolfley moved her belongings out of the mobile home that she was abandoning it. Regarding this matter, he testified as follows:

ATTORNEY: Okay. When did you first become aware that Mrs. Wolfley had moved out?

MR. SMITH: The day she moved out.

\*      \*      \*      \*      \*      \*

ATTORNEY: The Wolfleys' trailer on [the day Mrs. Wolfley removed her possessions from the mobile home] who owned the Wolfley's trailer?

MR. SMITH: As far as I was concerned the Russell National Bank owned it because Mrs. Wolfley had vacated it.

Further evidence of Mr. Smith's knowledge that Mrs. Wolfley had abandoned the mobile home is found in his testimony that he conducted a complete inspection of the mobile home on the day after Mrs. Wolfley moved out, making a list of the costs which would be involved in putting the home back into the condition it was in at the time it was purchased by the Wolfleys. Given these admissions by Mr. Smith, it is clear that the Dealer had actual notice of Mrs. Wolfley's abandonment of the mobile home. The Dealer was, therefore, aware that the Wolfleys had defaulted on their installment contract, that the Bank had possession of the mobile home, and that it might be called upon by the Bank to fulfill its obligations under the full recourse provision of the assignment contract. Having had such knowledge, the Dealer cannot complain to have been harmed by not receiving written notice from the Bank pursuant to section 623 G.1. Accordingly, the Dealer's obligations under the assignment contract remain intact.

■ The Bank argues further that the trial court erred in holding as a matter of law that its repossession of the mobile home negated the full recourse provision of the contract. We agree.

The full recourse provision of the contract states:

Seller agrees that in the event of default by Buyer in the full payment on the due date thereof of any installment payable under the contract or in the prompt obligation to be performed under the contract by the Buyer, Seller will, upon demand by Holder, forthwith repurchase the contract from Holder for a repurchase price in cash equal to the full unpaid balance of the contract as of the date of such repurchase, less any then unearned credit service charge computed in accordance with the "Rule of 78's."

Full recourse has become, in ordinary legal and commercial usage, a word meaning resort to a person who is secondarily liable after the default of the person who is primarily liable. Ballentine's Law Dictionary 1070 (3d ed. 1969). The person or institution entitled to full recourse, then, should be made 100 percent *whole* barring any express limitations of the contract or the failure to adhere to duties delineated by the law. By the full recourse provision of the instant contract, the Dealer unconditionally guaranteed payment of any remaining indebtedness under the contract and agreed to repurchase the contract upon demand by the Bank "in the event of default by [the Wolfley's]." Thus, pursuant to the express terms of this contract, the Bank was at all times during the course of the transaction deserving of 100 percent of its outlay. Any other interpretation of this provision would act to suppress commercial lending.

Full recourse contracts enable vendors to sell their goods to buyers who are high credit risks. Not being a bank, a vendor can hold only a limited number of installment contracts at a given time. Unless the vendor is able to assign the contracts in his or her hands over to a bank, he or she is unable to enter into new contracts with other buyers and thus, is limited in the amount of goods that he or she can sell. Because banks are reluctant to purchase installment contracts which involve debtors who have bad credit ratings, vendors must have leverage to make these contracts attractive to banks. The full recourse provision provides vendors that needed leverage. These provisions assure banks that they are protected in their dealings from bearing the brunt of a bad credit risk. The bank is assured when entering an assignment contract with a full recourse provision that it will be made whole regardless of the action of the debtor. The bank, therefore, agrees to purchase the installment contract from the vendor, thereby freeing up the vendor to enter into another installment contract with another buyer. This situation benefits vendors and buyers alike. The vendors are able to sell more goods and the buyers are able to buy goods they otherwise would be unable to purchase. An infringement on the enforcement

of the full recourse provision would discourage banks from entering into assignment contracts when there is a risk involved which they are reluctant to bear. Since the free flow of money in this Commonwealth is dependent upon the willingness of banks to enter into loan agreements with all types of individuals and business associations, including those with questionable credit backgrounds, an infringement on the full recourse provision, in turn, will impede the free flow of money. As a social policy, then, we must ensure that full recourse continues to mean that which it has always been understood to mean—that the principle is entitled to be made one hundred percent whole by the guarantor.

Pursuant to the MVSFA, the Bank was required to send notice to the Wolfleys of default and its intent to execute. Later, the Bank effectuated execution and repossession in order to eliminate the Wolfleys' equity in the trailer, and to prohibit a later claim of title by the Wolfleys. As the holder of title, the Bank was the only party empowered to commence such an action. This did not, in any way, affect the Bank's right to demand repurchase of the contract from the Dealer. The condition precedent, that is, the default by the Wolfleys, occurred, which permitted the Bank to proceed under the full recourse provision. Consequently, the Bank's full recourse rights remained intact notwithstanding the Banks efforts to remove the Wolfleys from the action through repossession.

Since the Bank is entitled to the return of *all* its investment, it can properly retain possession *and* exercise its option to request the Dealer to repurchase. At the time of repurchase, the Bank will then transmit title of the mobile home to the Dealer. In that manner, the Bank will properly be made whole pursuant to the full recourse clause.

Having found that the Bank did in fact retain its contractual right to demand repurchase of the contract, we conclude that the trial court erred in entering a directed verdict in favor of the Dealer. We therefore reverse and remand

the action to the trial court for proceedings consistent with this opinion. Jurisdiction is relinquished.

Reversed and remanded.